14-1261-cv(L)
Doe v. East Lyme Bd. of Educ.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: March 13, 2015    Decided: June 26, 2015)

Docket No. 14-1261-cv(L), 14-1638-cv(XAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JANE DOE, JOHN DOE, by and through his
parent Jane Doe,

> Plaintiffs-Appellees-
> Cross-Appellants,

- v.-

EAST LYME BOARD OF EDUCATION,

> Defendant-Appellant-
> Cross-Appellee,

DEPARTMENT OF EDUCATION, CONNECTICUT
STATE,

> Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:               JACOBS and LOHIER, <u>Circuit Judges</u>, and SHARPE, <u>District Judge</u>.<sup>*</sup>

The East Lyme Board of Education (the "Board") appeals from the judgment of the United States District Court for the District of Connecticut (Arterton, <u>J.</u>), holding that the Board violated the stay-put provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(j), and awarding reimbursement to Jane Doe and her son, John Doe.  The Does cross-appeal from the amount of reimbursement and from the district court's rejection of their other IDEA claims.

We affirm in most respects, but vacate and remand for entry of judgment in favor of the Does for the full value of services that the Board was required to fund under the stay-put provision, calculated from the date that Jane Doe initiated administrative proceedings, in part as reimbursement and in remaining part as compensatory education.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

---

<sup>*</sup>   Chief Judge Gary L. Sharpe, of the United States District Court for the Northern District of New York, sitting by designation.

EILEEN M. HAGERTY, Kotin, Crabtree & Strong, LLP, Boston, Massachusetts, for Plaintiffs-Appellees-Cross-Appellants.

SHELDON D. MYERS, Kainen, Escalera & McHale, P.C., Hartford, Connecticut, for Defendant-Appellant-Cross-Appellee.

DENNIS JACOBS, Circuit Judge:

John Doe (the "Student") has autism and requires special education services. He and his mother, Jane Doe (the "Parent"), reside within the East Lyme Public School District (the "District") under the jurisdiction of the East Lyme Board of Education (the "Board"). Up through the 2008-2009 school year, the Board and the Parent agreed on individualized education plans ("IEPs") setting forth special education services, consisting of school placement and additional related services, that the Board would provide or fund.

Following disagreements over the IEP for 2009-2010, the Parent placed the Student in a private school outside the District, and continued to privately obtain some (but not all) of the related services previously funded by the Board. The Board refused to pay for the private school or any related services on the ground

3

that it ceased to be responsible for the Student once he was enrolled outside the District.

The Parent brought suit under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., alleging that the Board offered an inadequate IEP for 2009-2010 and failed to offer any IEP for 2010-2011 (and subsequent school years), thereby denying the Student a free appropriate public education ("FAPE"), see 20 U.S.C. § 1412(a)(1).

The district court dismissed these claims. As to 2009-2010, the court ruled that the IEP provided the Student with a FAPE. As to 2010-2011 (and subsequent school years), the court ruled that the Board violated the IDEA by failing to offer any IEPs, but that the Parent was not entitled to relief because the private school in which she enrolled the Student was an inappropriate placement.

The court did award the Parent some relief. Citing the stay-put provision of the IDEA, 20 U.S.C. § 1415(j), which provides for a child's continuance in the "then-current educational placement" during the pendency of proceedings (absent agreement otherwise), the court ruled that the Board was in violation for failing to fund the related services described in the 2008-2009 IEP once the parties

4

reached an impasse. Accordingly, the court ordered the Board to reimburse the Parent for any such services she actually paid for out of pocket.

We affirm the judgment in most respects, but vacate the award of reimbursement and remand the case for further proceedings. We hold that the appropriate equitable relief for a stay-put violation is reimbursement or compensatory education (or both) for the full value of services that the educational agency was required to fund, not the (lesser) value of services the Parent was able to afford. We further hold that an educational agency's obligation to maintain stay-put placement is triggered when an administrative due process proceeding is initiated, not when an impasse is reached.

## BACKGROUND

The Student was nine years old at the beginning of the 2009-2010 school year. Because of his autism, the Student experiences difficulties with social interaction and communication, particularly, speech and reading. He and the Parent both reside within the District in East Lyme, Connecticut.

The Student attended public school in the District until December 2006, when the Board and the Parent agreed on publicly-funded placement at Hope

5

Academy, a private school. In 2008, dissatisfied with the Student's progress at Hope Academy, the Parent placed him at Solomon Schechter Academy ("Solomon") in New London, Connecticut. Solomon is a private religious school that provides no specialized instruction to students with disabilities. The Parent and the Board agreed that the Parent would pay the tuition at Solomon, while the Board would fund additional related services, such as specialized reading instruction and speech therapy, which would be delivered by private providers outside the classroom.

Accordingly, the Board issued an IEP in December 2008 (the "2008-2009 IEP"), which provided that the Parent would pay for tuition at Solomon, while the Board would pay for the following related services: Orton-Gillingham reading instruction (5 hours/week), speech therapy (2.5 hours/week), and occupational/physical therapy (1.5 hours/week). In February, the parties amended the IEP to increase speech therapy to 3 hours per week. As discussed in greater detail below, it is this amended 2008-2009 IEP that furnishes the "then-current educational placement" for stay-put purposes.

On June 17, 2009, the Parent met with Board representatives to discuss the 2009-2010 placement. Dr. Corinne Berglund, the Board's Director of Special

6

Education, advised the Parent that the Board would not pay for tuition at Solomon and suggested that the Student be enrolled instead at Niantic Center School ("Niantic"), a public school in the District. The parties reached an impasse. A month later, the Board issued an IEP (the "2009-2010 IEP") placing the Student at Niantic or his local elementary school and offering a program that included: a case manager, "code emphasis reading that incorporates Orton-Gillingham principles" (50 minutes/day), speech therapy (2.5 hours/week), occupational therapy (1 hour/week), and physical therapy (20 minutes/week). The Parent rejected the IEP, advised the Board that she would keep the Student at Solomon, and conveyed her expectation that the Board would continue paying for related services. The demands for related services were based on recommendations by the Student's treating clinician, Dr. Robert Kemper.

The Student continued to attend Solomon during the 2009-2010 school year, and was regularly pulled out of the classroom to receive special education services (which Solomon did not offer) from private providers. The Parent also arranged for the Student to receive some instruction over the summer. The Parent absorbed all of these educational expenses.

In August 2010, the Parent advised the Board that, unless she received a satisfactory IEP, she would continue the enrollment at Solomon for 2010-2011, and demanded reimbursement of her expenses. The Board refused, on the ground that the Student's enrollment at Solomon terminated the Board's obligations under the IDEA.

On April 27, 2010, the Parent filed an administrative due process complaint, which she temporarily withdrew, but then refiled, in September 2010. See 20 U.S.C. § 1415(f), (i); Conn. Gen. Stat. § 10-76h. The Parent alleged that the Board failed to provide the Student with a FAPE and violated various procedural requirements under the IDEA and Connecticut law. The Parent sought reimbursement of the tuition at Solomon and the costs of the related services.[1]

The administrative hearing officer ruled in favor of the Board. The officer found (inter alia) that the Board had offered a FAPE during the relevant school years, and that the lack of special education services at Solomon made it an inappropriate placement. Accordingly, the officer awarded no reimbursement.

---

[1]    The Parent did not seek reimbursement of Solomon tuition for the 2008-2009 school year, which the parties had agreed she would pay.

The Parent then sought judicial review in the United States District Court for the District of Connecticut.[2] See 20 U.S.C. § 1415(i)(2).

The parties cross-moved for summary judgment on the basis of the administrative record. The district court (Arterton, J.) ruled that as to 2009-2010, the Board offered the Student a FAPE, and that though the Board failed to propose an IEP for 2010-2011 (and the subsequent school years), the Parent was not entitled to relief because Solomon was an inappropriate placement.[3]

However, the court concluded that the Board violated the stay-put provision of the IDEA, 20 U.S.C. § 1415(j), by refusing to continue funding the related services described in the amended 2008-2009 IEP once the parties reached an impasse. The court held that the Board's obligation to fund those services triggered as of June 17, 2009 (when impasse was reached), and ordered the Board to reimburse the Parent for related services she funded since that date. Over the Parent's objection that the Board owed more services than she had been able to

---

[2]    The Connecticut State Department of Education, initially named as a defendant, was voluntarily dismissed.

[3]    The motions were referred to Magistrate Judge Margolis, who issued two recommended rulings that the district court adopted with modification.

afford, the court limited the amount of reimbursement to the Parent's out-of-pocket expenses.

The parties cross-appeal. The Board argues (<u>inter alia</u>) that the Student's enrollment at Solomon terminated its obligations under the IDEA altogether, that it prevailed on the FAPE claim, and that liability for a stay-put violation is conditional on the Parent's prevailing on the FAPE claim. The Parent argues (<u>inter alia</u>) that the Board failed to provide a FAPE, and that Solomon was an appropriate placement. The parties also contest the award of reimbursement on a number of grounds. Most significantly, the Board argues that the court improperly awarded reimbursement for services rendered before the Parent initiated administrative due process proceedings, while the Parent argues that the court should have awarded relief for the full value of the related services, not just the (lesser) value of services she was able to afford.

**DISCUSSION**

The Parent asserts two conceptually distinct claims: (I) a denial-of-FAPE claim based on the inadequacy of the 2009-2010 IEP, the Board's failure to issue IEPs for later school years, and the appropriateness of Solomon as an educational

placement, see 20 U.S.C. § 1412(a)(1); and (II) a stay-put claim based on the Board's refusal to fund related services described in the amended 2008-2009 IEP during the pendency of proceedings, see 20 U.S.C. § 1415(j). In connection with the stay-put claim, on which the Parent prevailed below, both parties contest the appropriateness of the relief fashioned by the district court, see 20 U.S.C. § 1415(i)(2)(C)(iii).

We review de novo the district court's rulings as to liability under the IDEA. Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 (2d Cir. 2005). We review for abuse of discretion the fashioning of relief under 20 U.S.C. § 1415(i)(2)(C)(iii). See Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7, 16 (1993); see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 170 (2d Cir. 2014).

# I

"Under the IDEA, federal money is available to assist state and local agencies in educating handicapped children, provided that the recipients of those funds comply with various provisions of the Act." Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 481 (2d Cir. 2002) (internal quotation marks

11

omitted).  Through its state and local educational agencies,[4] a participating state must make "[a] free appropriate public education . . . available to all children with disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).  To achieve that end, educational agencies must issue individualized educational plans ("IEPs") specifying "the educational needs of [the] handicapped child and the specially designed instruction and related services to be employed to meet those needs." Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 368 (1985); see 20 U.S.C. § 1414(d).  The term "related services" encompasses "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state."  Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006). Private placement is reimbursable only if "such placement, rather than a

_____

[4]   In this case, "state educational agency" refers to the Connecticut State Department of Education, see 20 U.S.C. § 1401(32), and "local educational agency" refers to the Board, see 20 U.S.C. § 1401(19).

12

proposed IEP, is proper under the Act."  Burlington, 471 U.S. at 369; see also 20

U.S.C. § 1412(a)(10)(C)(ii).[5]

"We undertake a three-step process to determine whether parents are

entitled to tuition reimbursement."  T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412,

417 (2d Cir. 2009); see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d

Cir. 2005).[6]  The first two steps concern the adequacy of the IEP: "whether the

school district has complied with the IDEA's procedural requirements" and

"whether the IEP is reasonably calculated to enable the child to receive

educational benefits."  T.Y., 584 F.3d at 417 (internal quotation marks omitted).

The third step concerns the appropriateness of the parent's placement: "whether

the private schooling obtained by the parents is appropriate to the child's needs."

Id. (internal quotation marks omitted).  The parent must prevail at all three steps

to receive reimbursement.

---

[5]    A state or local educational agency may also consent to publicly-funded placement at a private school if such placement is necessary to carry out the requirements of the IDEA.  20 U.S.C. § 1412(a)(10)(B)(i).

[6]    Our cases have sometimes collapsed the first and second steps into a single inquiry and, accordingly, characterized the analysis as having two (not three) steps.  E.g., Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 111-12 (2d Cir. 2007); M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000).  This is a difference of enumeration, not of substance.

**A**

The Parent argues that the Student was denied a FAPE for the 2009-2010 school year because the IEP issued by the Board that year was deficient both procedurally and substantively. We disagree.

**1**

The premise of the procedural claim is that the Parent was deprived of the right to participate in the development of the 2009-2010 IEP, because it was issued after the last meeting at which she was present.

Under the IDEA, the "IEP Team" responsible for developing an IEP must include the child's parents.[7] 20 U.S.C. § 1414(d)(1)(B). In addition, "[e]ach local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e); see also 34 C.F.R. § 300.501(b), (c); Conn. Gen. Stat. § 10-76d; Conn. Agencies Regs. § 10-76d-12. The IDEA thus confers on parents a right of "participation . . . throughout the development of the IEP." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.,

---

[7] Under Connecticut state law, the IEP Team is called the "planning and placement team" or "PPT." See Conn. Agencies Regs. § 10-76a-1(14). For consistency, we use the federal statutory term.

Westchester Cnty. v. Rowley, 458 U.S. 176, 206 (1982). At the same time, the duty to issue an IEP remains with the educational agency, see 20 U.S.C. § 1414(d)(2)(A), and a parent's right of participation is not a right to "veto" the agency's proposed IEP, T.Y., 584 F.3d at 420. Parental dissatisfaction is channeled through administrative and (if necessary) judicial proceedings. M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 62 (2d Cir. 2000); see 20 U.S.C. § 1415(i).

The Parent's right of participation was not violated. She fully participated in the June 17, 2009 meeting of the IEP Team at which the 2009-2010 placement was discussed. Nothing in the record suggests that the IEP Team ever met without her presence.

The argument comes down to whether the Board could, after the meeting, issue an IEP without the Parent being physically present. We conclude that it could. The right of participation encompasses the right to offer input and to have that input considered; it does not entail a right to be physically present throughout the agency's own decisional process. See 34 C.F.R. § 300.501(b)(3) (participation right does not require parental presence at "informal or unscheduled conversations involving public agency personnel" or "preparatory

15

activities that public agency personnel engage in to develop a proposal"). So long as a parent has a meaningful opportunity to offer input, parental rights to be part of the IEP Team, 20 U.S.C. § 1414(d)(1)(B), and to participate in "any group that makes decisions on the educational placement of [the] child," 20 U.S.C. § 1414(e), have been respected. See Cerra, 427 F.3d at 193-94 (finding no procedural violation where final IEP was issued over two months after IEP Team meeting at which parent "actively" participated).

**2**

The Parent's substantive challenge to the adequacy of the 2009-2010 IEP is likewise rejected. To be substantively adequate, an IEP must be "reasonably calculated to enable the child to receive educational benefits"; while an IEP need not "furnish every special service necessary to maximize each handicapped child's potential," it must be "likely to produce progress" that is more than "trivial advancement." Cerra, 427 F.3d at 194-95 (internal quotation marks and brackets omitted). On this question, substantial deference is owed to the judgments of state administrative officers. Id. at 191. "[C]ourts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Rowley, 458 U.S. at 208 (internal

16

quotation marks omitted); see also Gagliardo v. Arlington Cent. Sch. Dist., 489

F.3d 105, 112 (2d Cir. 2007); Cerra, 427 F.3d at 195.

The 2009-2010 IEP offered placement at a public school (Niantic) staffed

with a special education teacher, as well as: a case manager, "code emphasis

reading that incorporates Orton-Gillingham principles" (50 minutes/day), speech

therapy (2.5 hours/week), occupational therapy (1 hour/week), and physical

therapy (20 minutes/week).  The administrative hearing officer concluded that

this combination of placement and services was substantively adequate.  We see

no basis in the record to reject that conclusion.

* * *

For the foregoing reasons, the Board provided the Student with a FAPE for

the 2009-2010 school year.

**B**

The Board refused to propose an IEP for the 2010-2011 school year or any

of the subsequent school years.[8]  The district court concluded that this amounted

---

[8]    The parties and the district court focused on the 2010-2011 school year, but the same analysis applies to later school years, for which the Board also declined to offer IEPs.

to a denial of a FAPE, but that in any event the Parent was entitled to no relief because the Student's enrollment at Solomon was itself inappropriate. We agree.

**1**

The Board was required to offer the Student an IEP for 2010-2011 and each of the following school years. The IDEA requires that "[a]t the beginning of *each school year*, each local educational agency, State educational agency, or other State agency . . . shall have in effect, for each child with a disability *in the agency's jurisdiction*, an individualized education program." 20 U.S.C. § 1414(d)(2)(A) (emphases added); see also 34 C.F.R. § 300.323. It is undisputed that the Student was, at all relevant times, resident in East Lyme and within the Board's jurisdiction. The Board therefore violated the IDEA by failing to offer IEPs for these school years, and these violations deprived the Student of a FAPE. "[W]hen a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP." Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 238-39 (2009).

The Board argues that the Student's enrollment at Solomon, outside of the District's borders, terminated any obligations it owed under the IDEA. That is

incorrect. A local educational agency's duty to provide a FAPE is not ended by enrollment of a resident child in a private school outside the district. True, the educational agency in the jurisdiction where the private school is located may have its own obligations, most notably, the obligation to conduct "child find." See 34 C.F.R. § 300.131(a) ("Each [local educational agency] must locate, identify, and evaluate all children with disabilities who are enrolled by their parents in private . . . schools located in the school district served by the [agency]."). But the duty to offer a FAPE remains with the agency where the child resides; and a FAPE cannot be offered unless an IEP is issued. See 71 Fed. Reg. 46593 (Aug. 14, 2006) ("If a determination is made by the [local educational agency] where the private school is located that a child needs special education and related services, the [local educational agency] *where the child resides* is responsible for making FAPE available to the child." (emphasis added)).

The IDEA thus provides that a local educational agency is relieved of its obligation to pay for a resident child's private school tuition "if that agency *made a free appropriate public education available* to the child and the parents elected to place the child" elsewhere. 20 U.S.C. § 1412(a)(10)(C)(i) (emphasis added); see also Frank G., 459 F.3d at 370. But without the benefit of an IEP from the district

of residence, a parent could not intelligently evaluate whether the child was offered a FAPE or "elect[] to place" the child elsewhere.[9] Thus an educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district.

**2**

The Board's failure to provide a FAPE notwithstanding, the Parent is entitled to relief only if she meets "the burden of demonstrating that [the] private placement was appropriate." Gagliardo, 489 F.3d at 112. Generally, "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement"; accordingly, the private placement

---

[9] A local educational agency may not be required to offer an IEP if the parent's expressed intention is to enroll the child in a private school outside the district, without regard to any IEP. See 71 Fed. Reg. 46593 ("If the parent makes clear his or her intention to keep the child enrolled in the private . . . school located in another [jurisdiction], the [local educational agency] where the child resides need not make FAPE available to the child."); see also J.G. v. Briarcliff Manor Union Free Sch. Dist., 682 F. Supp. 2d 387, 397 (S.D.N.Y. 2010). But see Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994) ("We find that a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement."). In this case, there is no evidence that the Parent would have categorically refused any IEP the Board offered.

must be "reasonably calculated to enable the child to receive educational benefits." Frank G., 459 F.3d at 364 (internal quotation marks omitted).

The administrative hearing officer found that the placement at Solomon was inappropriate because that school was not tailored to meet the Student's special needs, which had to be addressed by outside providers. True, "[a]n appropriate private placement need not meet state education standards or requirements" or "provide certified special education teachers or an IEP for the disabled student." Frank G., 459 F.3d at 364; see also Carter, 510 U.S. at 13. However, "assessment of educational progress is a type of judgment for which the district court should defer to the [administrative hearing officer's] educational experience." Frank G., 459 F.3d at 367 (internal quotation marks omitted).

We see no reason to overturn the administrative officer's finding, which is adequately supported by the record. A representative from Solomon testified that the school did not offer any special education services and did not modify its curriculum to fit the Student; to receive the special instruction recommended by

Dr. Kemper, the Student had to be pulled out of classes frequently.[10] The main benefits of Solomon to the Student were small class sizes and some modified grading procedures. But the former is the "the kind of educational and environmental advantage[] . . . that might be preferred by parents of any child, disabled or not." Gagliardo, 489 F.3d at 115. And the latter, while an accommodation, "did not provide the special education services specifically needed by [the Student]--namely, an educational setting consistent with [the clinician's] recommendation." Id. at 114. Solomon did not provide any of the specialized instruction recommended by Dr. Kemper.

\* \* \*

In summary: the Board denied the Student a FAPE during the 2010-2011 school year (and subsequent school years); the district court nevertheless properly awarded no relief as to that claim because enrollment at Solomon was itself inappropriate for the Student; accordingly, and in light of our conclusion that the Student received a FAPE for 2009-2010, we affirm the district court's grant of summary judgment in the Board's favor on the FAPE claim.

---

[10] Because of the need for outside services, the Student regularly missed his classes in social studies, art, math, and computers.

22

We turn to the stay-put claim, on which the Parent prevailed before the district court.

## II

The stay-put provision of the IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). The purpose of the provision is "to maintain the educational status quo while the parties' dispute is being resolved." T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014). "It therefore requires a school district to continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete." Id. at 171.

## A

To determine a child's "then-current educational placement," a court typically looks to: (1) "the placement described in the child's most recently implemented IEP"; (2) "the operative placement actually functioning at the time when the stay put provision of the IDEA was invoked"; or (3) "the placement at

23

the time of the previously implemented IEP." Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist., 386 F.3d 158, 163 (2d Cir. 2004) (internal quotation marks, ellipsis, and brackets omitted).[11]

As the district court determined, the Student's stay-put placement was the placement described in the 2008-2009 IEP (as amended in February 2009), which was both the most recently implemented IEP and the last one agreed upon by the parties. It is undisputed that the Board refused to pay for the services described in that IEP during the pendency of administrative and judicial proceedings. The Board thus violated the stay-put provision.

The Board's arguments to the contrary are meritless.

First, the Board argues that the Parent should not be permitted to obtain reimbursement for tuition at Solomon by unilaterally enrolling the Student there. But the stay-put claim does not seek reimbursement of Solomon tuition; it seeks relief for the related services.

Second, the Board argues that the related services it agreed to fund did not form part of the Student's educational placement for 2008-2009. To the contrary,

---

[11] A stay-put placement may also be created by the parties' agreement or by administrative or judicial order. Schutz, 290 F.3d at 484.

the IDEA defines "free appropriate public education" to include "special

education *and related services*," 20 U.S.C. § 1401(9) (emphasis added); and the term

"related services" is defined to mean services that "may be *required* to assist a

child with a disability to benefit from special education," 20 U.S.C. § 1401(26)(A)

(emphasis added). We have applied the stay-put provision to payments for

related services. E.g., T.M., 752 F.3d at 151.[12]

Third, the Board argues that the 2008-2009 IEP cannot be a stay-put

placement because the parties intended it to be a temporary arrangement. That is

beside the point. The Board's obligation to fund stay-put placement is rooted in

statute, not contract. The parties' intent as to the duration of the IEP (or the

February 2009 amendment to it) therefore does not matter.

Finally, the Board contends that it cannot be held liable for a stay-put

violation if it in fact provided a FAPE. Not so. "A claim for tuition

---

[12]   The Board cites Zvi D. by Shirley D. v. Ambach, 694 F.2d 904, 908 (2d Cir. 1982), for the proposition that, in the context of stay-put, "[p]ayment and placement are two different matters." But, in Zvi D., the payment obligation was imposed by a stipulation entered into for litigation purposes; here, the obligation to fund related services arises from an IEP. In any event, we have expressed doubts that this aspect of Zvi D. remains good law. See Schutz, 290 F.3d at 483 n.7 ("Zvi D. predates the [Supreme] Court's decision in Burlington, and the consequent changes to the federal regulations.").

25

reimbursement pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP." Mackey, 386 F.3d at 160. "Section 1415(j) represents Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." Id. (citation, internal quotation marks, and brackets omitted); see also T.M., 752 F.3d at 170. In short, the stay-put provision means that an educational agency is required to maintain the status quo placement even if the child would otherwise have no substantive right to it. See Mackey, 386 F.3d at 165.

The Supreme Court's decision in Burlington is not to the contrary.[13] Burlington observed that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk" because "[i]f the

---

[13]    The Board also misreads 20 U.S.C. § 1412(a)(10)(C)(i). That section provides that private school tuition is not reimbursable through a *FAPE* claim if the educational agency in fact offered a FAPE. See Frank G., 459 F.3d at 370. It does not insulate an educational agency from liability for violating its separate legal duty--under a different section of the statute, 20 U.S.C. § 1415(j)--to preserve a stay-put placement during the pendency of proceedings.

courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated [§ 1415(j)]."[14]  471 U.S. at 373-74.

Burlington stands for an unremarkable proposition: when a parent *rejects* a stay-put placement by unilaterally placing the child elsewhere, retroactive reimbursement for the unilateral placement is available, if at all, only through a FAPE claim.  See T.M., 752 F.3d at 172 ("When [the child's] parents rejected [the agency's] offer to provide pendency services directly for the 2011–2012 year, they took responsibility for the cost of obtaining those services from private providers." (citing Burlington, 471 U.S. at 373-74)).

We are not confronted with a Burlington scenario.  Under the 2008-2009 IEP, the Student was to attend Solomon at parental expense and to receive related services at the expense of the Board.  While paying for the related services herself, the Parent maintained that continuous placement during the pendency of this litigation.  And far from declining the protection of stay-put, the Parent

---

[14]  At the time Burlington was decided, the stay-put provision was codified at 20 U.S.C. § 1415(e)(3).

actively invoked it. At the June 2009 IEP Team meeting, she repeatedly

demanded that the Board continue to provide stay-put placement:

> You're proposing a change of placement. There was an IEP from
> East Lyme, saying he's here. Now you're changing the placement. It
> violates Stay Put. He's supposed to stay here until we have a
> proceeding. . . .
>
> What I'm saying is you're violating my Stay Put rights . . .
>
> How is this not in violation?

Tr. of Planning and Placement Team Meeting, at 6:14-17, 10:4-5, 11:1-2 (June 17,

2009).

For the foregoing reasons, we affirm the district court's grant of summary

judgment in favor of the Parent on the stay-put claim.

**B**

We turn now to the issue of relief. In any action brought under the IDEA,

the court "shall grant such relief as the court determines is appropriate." 20

U.S.C. § 1415(i)(2)(C)(iii). The only restriction is that "the relief is to be

appropriate in light of the purpose of the Act." Burlington, 471 U.S. at 369

(internal quotation marks omitted). "[E]quitable considerations are relevant in

fashioning relief and the court enjoys broad discretion in so doing." Carter, 510

28

U.S. at 16 (citation and internal quotation marks omitted).  An award of damages is not available, Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 486 (2d Cir. 2002); but a court may award various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies, Burlington, 471 U.S. at 369; Polera, 288 F.3d at 486.

The district court ordered the Board to reimburse the Parent for her out-of-pocket expenses on related services incurred since June 17, 2009, when the parties reached an impasse about the Student's placement.  Both parties contest this relief.

**1**

Some of the competing arguments merit little discussion.

The Board argues that the Parent is entitled to reimbursement for only 2.5 hours of speech therapy per week, not 3 hours per week, as specified in the February 2009 amendment to the 2008-2009 IEP.  That position is meritless.  For the reasons discussed above, the February 2009 amendment controls, even if the parties intended it to be temporary.

The Parent argues that she should be reimbursed for the "extended school year" services that she obtained in the summertime. But the amended 2008-2009 IEP makes no mention of such services. The Parent argues that they should be extrapolated from the term-time services in the 2008-2009 IEP or from the summertime services set forth in the IEP for *2007-2008*. We disagree. The 2008-2009 IEP left the sections for summertime services blank; and the 2007-2008 IEP was not the one most recently implemented or last agreed upon.

The Board argues that the Parent was required to administratively exhaust her stay-put claim. The Board is wrong: "an action alleging violation of the stay-put provision falls within one, if not more, of the enumerated exceptions to" the IDEA's exhaustion requirement. Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 199 (2d Cir. 2002). Since the purpose of the stay-put provision is to keep the child in an existing placement until all proceedings-- administrative and judicial--have run their course, there is no evident reason why administrative proceedings should have to be recommenced to that end. Id. Applying the exhaustion requirement to stay-put claims would create a loop of marathon proceedings, since each new round of administrative proceedings

30

would itself be subject to a fresh round of judicial review.  See 20 U.S.C. § 1415(i)(2).

2

The Board and the Parent each raise one meritorious objection to the district court's award of relief.

*  *  *

The district court held that the stay-put obligation was triggered on June 17, 2009, when the parties reached an impasse.  The Board argues that any such obligation was triggered when the Parent initiated administrative due process proceedings on April 27, 2010.

The plain language of the stay-put provision supports the Board's position. The provision governs the obligations of parties during "the pendency of any *proceedings* conducted pursuant to *this section*," 20 U.S.C. § 1415(j) (emphases added); and the word "proceeding" is used in § 1415 exclusively to describe administrative due process proceedings and judicial actions, see 20 U.S.C. § 1415(i).  This reading of the statute is reinforced by the implementing regulation.  34 C.F.R. § 300.518 ("[D]uring the pendency of any *administrative or judicial proceeding* regarding a due process complaint notice requesting a due process hearing under § 300.507, unless the State or local agency and the parents

31

of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.").

The district court appears to have followed our summary order in A.S. ex rel. P.B.S. v. Bd. of Educ. for Town of W. Hartford, 47 F. App'x 615, 616 n.2 (2d Cir. 2002) (summary order) ("Under the IDEA, a stay put is a procedural right that is activated as soon as the [IEP Team] reaches an impasse." (internal quotation marks omitted)). A.S., which is not precedential, is also distinguishable. The plaintiff filed a due process complaint as soon as the parties reached their impasse, so the filing coincided with the impasse. Id. at 616. Here, the Parent filed her due process complaint almost a full year after the impasse was reached. In any event, the statute is clear that the Board's obligation to provide stay-put services was not triggered until the Parent's administrative complaint was filed.

* * *

The Parent argues that the district court abused its discretion by limiting the award of relief to her out-of-pocket expenses instead of awarding the full value of services that the Board should have provided. We agree that in this case

the award of less than the full value of stay-put services was inappropriate, given the purposes of the IDEA.  Burlington, 471 U.S. at 369.

The award in this case was calculated in a way that would undermine the stay-put provision by giving the agency an incentive to ignore the stay-put obligation.  If it turns out in the end that the parent was able to finance all the services, the agency would simply pay what it should have paid in the first place. Cf. Burlington, 471 U.S. at 370-71 ("Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance.").  On the other hand, if the parent cannot afford to finance all or any services, the agency gets to pay less than what it should have, or nothing--and, more important, less than what was needed for the child's benefit. Moreover, such an arrangement would make the stay-put obligation contingent on the means of a child's family--a legally irrelevant variable.  Cf. E.M. v. New York City Dep't of Educ., 758 F.3d 442, 452 (2d Cir. 2014) ("The IDEA promises a free appropriate education to disabled children without regard to their families' financial status."); Miener By & Through Miener v. State of Mo., 800 F.2d 749, 753 (8th Cir. 1986) ("We are confident that Congress did not intend the child's

entitlement to a *free* education to turn upon her parent's ability to 'front' its costs.").

Reimbursement is a remedy limited to what has been paid. And an award of damages to make up the difference is impermissible under the IDEA. Polera, 288 F.3d at 486. There is, however, another remedy: compensatory education. "Compensatory education is prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education."[15] Somoza v. N.Y.C. Dep't of Educ., 538 F.3d 106, 109 n.2 (2d Cir. 2008) (internal quotation marks omitted); see also P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed., 546 F.3d 111, 123 (2d Cir. 2008).

Although we have typically endorsed compensatory education as a remedy for substantive FAPE claims, see, e.g., P., 546 F.3d at 123, there is no

---

[15] Because the obligations imposed by the IDEA generally terminate when a child reaches the age of 21, compensatory education "is unavailable to a claimant over the age of twenty-one in the absence of gross procedural violations." Garro v. State of Conn., 23 F.3d 734, 737 (2d Cir. 1994) (internal quotation marks omitted); see also Mrs. C. v. Wheaton, 916 F.2d 69, 75 (2d Cir. 1990). We need not decide whether the Board's failure to maintain a stay-put placement was a "gross" procedural violation, because the Student (who was nine at the start of the 2009-2010 school year) will not turn 21 for many years.

reason why the remedy should not be equally available for stay-put violations. We therefore conclude that when an educational agency has violated the stay-put provision, compensatory education may--and generally should--be awarded to make up for any appreciable difference between the full value of stay-put services owed and the (reimbursable) services the parent actually obtained. In this case, the Board owes reimbursement in the amount the Parent expended for services the Board was required to provide, plus compensatory education to fill the gap of required services that the Parent did not fund.

In light of the foregoing, we vacate the district court's award of relief as to the Parent's stay-put claim. On remand, the district court should: calculate the total value of the related services specified in the amended 2008-2009 IEP for the period from April 27, 2010,[16] to the (as yet undetermined) date of the new final judgment, see 20 U.S.C. § 1415(j); order the Board to reimburse the Parent for out-of-pocket expenses incurred on covered services during that period; and direct the Board to provide (with the Parent's requisite participation) the remainder of

---

[16] It would be inequitable to exclude from reimbursement the services that were obtained between September 23, 2010, when the initial administrative complaint was withdrawn without prejudice, and September 30, 2010, when it was refiled. That brief delay--which was necessitated by the Parent's need to obtain new counsel--did not prejudice the Board.

the total value as compensatory education to commence at the conclusion of litigation.

We leave the mechanics of structuring the compensatory education award to the district court's sound equitable discretion, although the court may wish to consult remedies that we have endorsed in the past.  See Streck v. Bd. of Educ. of the E. Greenbush Cent. Sch. Dist., 408 F. App'x 411, 415 (2d Cir. 2010) (summary order).  Given the possibility that the Student's educational needs have changed since the commencement of proceedings, we leave to the district court whether compensatory education should be limited to the kinds of services[17] specified in the amended 2008-2009 IEP, or encompass analogous educational services appropriate to the Student's current needs.  See Reid ex rel. Reid v. D.C., 401 F.3d 516, 524 (D.C. Cir. 2005) ("[T]he ultimate award [of compensatory education] must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.").  Whatever its precise form, the remedy must

---

[17]  "The IDEA's pendency provision does not entitle a disabled child to keep receiving services from the exact same service providers while his proceedings are pending; instead, it only entitles the child to receive the same general type of educational program."  T.M., 752 F.3d at 171.

be "appropriate in light of the purpose of the Act." <u>Burlington</u>, 471 U.S. at 369

(internal quotation marks omitted).


## CONCLUSION

We have considered the parties' remaining arguments and conclude that

they are without merit. For the foregoing reasons, the judgment is affirmed in

part and vacated in part. The case is remanded to the district court for further

proceedings consistent with this opinion.